UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

JOSE DELGADILLO,

                Petitioner,                          **06 Civ. 0794 (SCR)(PED)**

   -  **against -**                              **REPORT AND**

**THOMAS POOLE, ACTING SUPERINTENDENT,**                **RECOMMENDATION**
**FIVE POINTS CORRECTIONAL FACILITY,**

                Respondent.

-------------------------------------------------------------X

TO:   **THE HONORABLE STEPHEN C. ROBINSON,**
        **UNITED STATES DISTRICT JUDGE**

I.    <u>**Introduction**</u>

      Jose Delgadillo seeks, by his *pro se* petition for a writ of habeas corpus under 28

U.S.C. § 2254, an order vacating the judgment of conviction entered on August 1, 2002,

following a trial by jury, in the Supreme Court of the State of New York, County of

Westchester (Molea, J.).  Petitioner was convicted of a single count of kidnapping in the

second degree, two (2) counts of robbery in the first degree, three (3) counts of robbery in

the second degree, a single count of criminal use of a firearm in the first degree, a single

count of attempted rape in the first degree, two (2) counts of attempted robbery in the

first degree, and a single count of criminal use of a firearm in the second degree.

Petitioner was sentenced to a determinate term of imprisonment of 23 years on

September 20, 2002.

On December 27, 2004, the Appellate Division of the Supreme Court of the State of New York affirmed the judgment of conviction. On May 6, 2005, the State of New York Court of Appeals denied leave to appeal the conviction.

For the reasons set forth below, I respectfully recommend that this petition be **DENIED.**

## II.   FACTS

Petitioner was convicted of a series of crimes in White Plains, New York. In brief, the State's evidence showed that on September 21, 2001, Petitioner attempted to rob a bank patron, Paula Rooke, at gunpoint; stole a vehicle belonging to another patron, Gregorio Cabrera; kidnapped the passenger in Cabrera's vehicle, Gloria Perez; and, finally, attempted to rape and rob Perez at gunpoint. After Perez escaped and sought refuge in a community center, Petitioner and a co-worker, Segundo Moran, were apprehended nearby by the White Plains police.

The evidence presented at trial supports the following.

On September 21, 2001, **Paula Rooke** stopped at the Bank of New York at 285 Maple Avenue in White Plains, New York, at approximately 7:15 p.m. (T: 765).[1] She left her vehicle running and went to use the bank's automated teller machine ("ATM"). Rooke observed a man attempting to enter her automobile and went to confront him (T: 767). The man then aimed a gun at Rooke's head and demanded money (T: 768-769). Rooke advised the robber that she had no money (T: 769). The robber spoke briefly with Rooke, telling her he was "gonna get somebody tonight, some Mexicans" and that he was upset about the World Trade Center (T: 769). A video camera at the bank captured

---

[1] Notations preceded by "T" refer to the state trial transcript. Those preceded by "PE" refer to the exhibits introduced at trial by the State.

images of: (1) Rooke at the ATM machine; (2) a man approaching Rooke's car; (3) a man attempting to enter Rooke's car; and (4) the same man pointing a gun at Rooke's head (PE 99, 100, 101, and 103). Rooke described the robber as wearing a cornrow hairstyle (T: 786). After this conversation, Rooke recalls a red truck entered the bank parking lot (T: 769).

**Gregorio Cabrera**, driving a red Jeep Cherokee, pulled into the Bank of New York with the intention of withdrawing money from the ATM (T: 804-807). He observed two (2) people speaking to each other, one of whom he described as "a female, black, short" (T: 807).[2] The other was a man (T: 808). As Cabrera was collecting funds from the ATM, he observed his Jeep back up and then drive off at a high speed with Gloria Perez in the passenger seat and a "black guy with the black sweatshirt" driving (T: 808). The driver was wearing cornrows (T: 812). Cabrera further observed a black Dodge Durango back into a post and follow his Jeep out of the bank parking lot (T: 813-814). The collision with the post caused damage to the rear of the Durango (T: 814).[3]

**Rita Alcalde**, who was walking past the Bank of New York, also observed the Durango speed out of the bank's parking lot (T: 837-838).

**Gloria Perez** was a passenger in Cabrera's red Jeep. While Cabrera was in the bank, a man with braids in his hair and wearing a black shirt (later identified as Petitioner) got into the Jeep, put a handgun to the Perez's head, and told her he was going to kill her (T: 876-877). He then told Perez they would be going "far away" from there and drove out of the bank's parking lot (T: 878). The perpetrator then advised Perez he

---

[2] Rooke is under 5' 5" (T: 782).
[3] The White Plains Police Department would find "a considerable amount of broken glass" under a pole in the bank parking lot on the night of September 21, 2001 (T: 966).

3

would be taking her somewhere and that he was seeking Bin Laden as Bin Laden had killed one of his sisters (T: 878-879).

While driving Cabrera's Jeep, the perpetrator was "communicating with another person" by means of a walkie-talkie (T: 879). Perez noted the presence of a black Durango following the Jeep for at least part of the drive (T: 882). After 10 minutes of driving, the Jeep stopped and the black-shirted driver requested that Perez turn on the Jeep's interior lights (T: 883). He also told Perez to kiss him (T: 883). When Perez declined to do so, the driver told her that she was "pretty" and that he was Dominican (T: 883). He also demanded she turn the lights back off as he was going to kill her (T: 883). When Perez was unable to turn off the lights, the driver broke the bulb with his fist (T: 884). They then drove off, eventually stopping at an abandoned gas station (T: 884).

At the gas station, Perez and the perpetrator met up with a Hispanic man in a white shirt who arrived driving a black Dodge Durango (T: 886-887). The driver of the Durango aimed a gun at Perez and told her he was going to kill her (T: 887-888). The black-shirted man told the other not to kill Perez as "he was gonna have fun" with her and then the two men forced Perez into the back seat of the Durango (T: 888). Perez identified Petitioner, Jose Delgadillo, as the black-shirted man (T: 888-889). After moving Perez to the Durango, the vehicle left the gas station with the white-shirted man driving and the other in the backseat along with Perez (T: 891-892).

The Durango stopped again. The white-shirted man exited the vehicle while the other stayed in the rear of the Durango with Perez (T: 892). The black-shirted man told

Perez to hide, but to open her legs (T: 892). He also hit her in the face (T: 892-893).[4] Perez was then driven to another location, again with the man in the white shirt driving while the man in the black shirt sat in the backseat with Perez (T: 893).

Upon stopping, the man in the black shirt told Perez, at gunpoint, to take her clothes off as he wanted to have sex with her (T: 894). After Perez refused to do so, indicating that he should kill her, the black-shirted man grabbed her by the neck (T: 895-896). He then undressed himself, removing his sandals, his pants and his underwear (T: 896-897). The assailant also attempted to remove Perez's pants by unzipping them (T: 899). After Perez' pants were unzipped, the white-shirted man returned to the vehicle, stating that he wanted to see the other have sex with Perez (T: 899-901). When he opened the door to enter the Durango, Perez pushed out and ran from the vehicle and toward a nearby road in order to seek help (T: 902). The men attempted to follow her in the Durango (T: 903). Perez ran until she entered the Jewish Community Center of Westchester ("JCC")[5]—coincidentally, the employment site both Delgadillo and Moran—and asked for help, telling the people in the building that somebody wanted to rape her (T: 903; 913).

**Marvin Thomas**, an employee of the JCC, encountered Perez in the JCC's kitchen and told other workers to lock the doors (T: 851). He went outside where he saw the Durango and yelled "Segundo" (T: 851).[6] The Durango drove off (T: 851). When

---

[4] There is a conflict between Perez' trial testimony and her grand jury testimony as to the number of times she was struck.

[5] Witnesses refer to this location interchangeably as either the "Jewish Community Center" the "synagogue," or the "temple." The facility is no longer a community center but is the site of Congregation Kol Ami in White Plains.

[6] Earlier in the evening, Thomas had encountered Segundo Moran, another employee of the JCC, and the owner of a black Dodge Durango, at "7:30, maybe 8:00ish" at the JCC

5

Thomas re-entered the building, Lenny, Moran's older brother, was speaking to a 911 operator (T: 846; 855). Due to an apparent communication problem, Thomas took the phone from Lenny and spoke to the 911 operator (T: 855).

A White Plains police officer, **Jose Formosa**, responded to the emergency call and went to the JCC where he interviewed Perez (T: 936). The 911 call also resulted in notification to the White Plains police to seek out a black Dodge Durango in association with an incident at the Bank of New York (T: 1029). Another White Plains police officer, **Steven Demchuk**, saw a Durango at the intersection of Soundview Avenue and West Post Road in White Plains and effected a stop of the vehicle (T: 1030-1033). Said stop occurred at Maple and Oakwood Streets in White Plains (T: 1033). Moran was driving the Durango; Delgadillo was a passenger. (T: 1035-1036). Formosa drove Perez from the JCC to Maple and Oakwood where, from inside the police car, she identified Moran and Delgadillo as the men who had kidnapped and attempted to rape her (T: 905-906). Moran and Delgadillo were placed under arrest (T: 941).

The investigation conducted by the White Plains Police Department produced several pieces of evidence introduced by the State at Petitioner's trial. Upon inspection of the synagogue parking lot on the night of September 21, White Plains Detective **John Daly** found a blue walkie-talkie radio (PE 120), a black sandal, and three paint stirrers marked Home Depot (T: 968-969). Thomas identified the walkie-talkie as of the type provided to Petitioner and Moran by the JCC for use in their employment (T: 856-857). Perez also identified the walkie-talkie found as that which Delgadillo was talking into on

---

(T: 847). He specifically noted a "bump" or "dent" to the rear of Moran's truck (T: 847-849). When asked by Thomas what happened to the truck, Moran did not respond (T: 849; 862).

the night of the crimes (T: 880). Perez further identified the sandal (PE 121) as that

removed by the black-shirted man in the course of disrobing (T: 897). The paint stirrers

found at the parking lot (PE 126) were substantially similar to paint stirrers found in the

Durango (PE 127 and 128).

Petitioner was convicted on all charges. He appealed his conviction, and the

Appellate Division denied his appeal. *See State v. Delgadillo*, 13 A.D.3d 643 (N.Y. App.

Div. 2004). A request to the New York Court of Appeals for leave to appeal was denied.

*See State v. Delgadillo*, 831 N.E.2d 975 (N.Y. 2005). Petitioner then filed the instant

petition, claiming: (a) insufficient evidence to support his conviction; (b) improper

"bolstering" of identification testimony; and (c) ineffective assistance of counsel.

## III.   Analysis

### A.   Exhaustion in State Court

As a threshold matter, a federal court may not consider a petition for a writ of

habeas corpus unless the petitioner first exhausts all available state court remedies as to

each of his claims. *See* 28 U.S.C. § 2253(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275

(1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). Substantively, a petitioner must

raise a federal or constitutional claim in state court and must inform the state court of

"both the factual and the legal premises of the claim [he] asserts in federal court."

*Rodriguez v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997)(quoting *Daye v. Attorney Gen.*,

696 F.2d 186, 191 (2d Cir. 1982)(en banc)). Procedurally, a petitioner must pursue his

claim through all levels of appeal in the state court system, so that eventually he

"present[s] the substance of his federal claims 'to the highest court of the pertinent

state.'" *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)(quoting *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).

Petitioner presented the instant assertions to the New York Supreme Court Appellate Division, which affirmed the judgment of the trial court. *See State v. Delgadillo*, 13 A.D.3d 643 (N.Y. App. Div. 2004). Leave to appeal the Appellate Division's ruling was denied by the Court of Appeals of New York. *See State v. Delgadillo*, 831 N.E.2d 975 (N.Y. 2005). Petitioner, then, has exhausted all potential state court remedies as to the claims presented.

**B.      Timeliness**

28 U.S.C. § 2244(d)(1), as amended by Section 101 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides a one-year statute of limitations for habeas corpus petitions. The applicable subsection of this statute reads as follows:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A)      the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

Petitioner's conviction became final 90 days after rejection of the New York Court of Appeals denied his motion for leave to appeal, i.e., August 4, 2005. As the instant petition was filed on December 27, 2005, it is timely under the referenced statute.

**C.      First Ground Asserted: Insufficiency of Evidence**

With regard to a habeas claim for insufficiency of evidence, the standard of review is set forth in the AEDPA, which states that a writ may not be granted "unless the

adjudication of the claim- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Murden v. Artuz*, 497 F.3d 178, 197 (2d Cir. 2007). Petitioner's claim is as to the latter, i.e., a lack of evidence supporting his conviction. As enunciated by the Supreme Court, "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In reviewing the sufficiency of the evidence, we must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor. *Id.* at 319, 326. As such, "a defendant making such a challenge bears a very heavy burden." *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)(internal quotation marks omitted).

Petitioner's assertion of insufficient evidence to support his conviction rests on his contention that "[t]he alleged victim's testimony alone is the sole reason the trier of the fact found the Defendant/Appellant guilty of the crime he was accused of." *See* Pet. at 7. As a matter of law, however, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004), quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979). In *Danzey*, the Court found sufficient identifications made by a witness who briefly observed the defendants from a second story window across the street from the vehicles

from which they emerged.  The eyewitness in the instant matter, Gloria Perez, spent

considerably more time in the presence of the individual she has identified—nearly two

(2) hours—and at much closer range.  Perez' testimony also demonstrates that she viewed

Petitioner with the lights on in the Jeep.  Perez' testimony alone, then, is adequate to

defeat Petitioner's claim.

Further, contrary to Petitioner's assertion, the State adduced substantial additional

evidence, apart from Perez's identification, in support of his convictions.  Paula Rooke

testified about her encounter with a man who attempted to rob her and this testimony was

corroborated by the videotapes monitoring the ATM machine at which the encounter took

place.  Individual frames of those videotapes suggested that Rooke's assailant wore his

hair in cornrows.  Gregorio Cabrera, in turn, testified to seeing a man in cornrows drive

off in his Jeep with Perez, followed by a black vehicle which sustained damage due to a

collision with a post.[7]

Cabrera further testified that a black Dodge Durango followed his Jeep as it sped

away.  This same Durango was identified by Perez as that in which she was held captive.

This identification was made by details specific to the vehicle in which Delgadillo was

captured, i.e., a rear window display of a ram's head and collision damage to the rear end

of the vehicle.  Thomas specifically identified Moran's Durango as having sustained the

damage described by Cabrera.

Physical evidence presented by the State at trial supported the jury's verdict.

Uncommon items, i.e., a walkie-talkie radio and Home Depot paint stirrers, were found in

---

[7] Rooke and Cabrera – unlike Perez – did not identify Petitioner at trial.  However, the
testimony of these two victims, including each witness's description of the robber's corn-
row hairstyle, dovetails closely with Perez's account.  The jury could easily conclude that
all three individuals were victimized by the same person.

the parking lot of the synagogue and testimony tied Petitioner to these items through his work at the JCC and his presence in Moran's Durango.  Further, Petitioner was shoeless when arrested.  Perez identified the sandal located in the synagogue parking lot as the type removed by her assailant during the course of the attempted rape.  A reasonable jury could easily infer that Petitioner was in his stocking feet because he had left his sandals behind  in the parking lot when he fled the JCC..

Thus, a rational trier of fact could readily conclude that the subject arrested in the vehicle seen by multiple witnesses tailing the Jeep in which Perez was abducted and wearing the same distinctive hair style was the same person identified by Perez as her attacker.  Given this evidence, Petitioner fails to meet the heavy burden described in *Quirama* and, therefore, this claim should be dismissed.

### D.      Second Ground Asserted: *Trowbridge* Error

Petitioner alleges the state court erred by permitting improper "bolstering" of  the testimony of the certain witnesses (Gloria Perez and Detective Formoso), through the admission into evidence of  "mug shots" taken at the time of Petitioner's arrest. [8]  *See* Pet. at 8 – 9A.  Petitioner contends such bolstering is improper under *People v. Trowbridge*, 113 N.E.2d 841 (N.Y. 1953).  In *Trowbridge*, the New York Court of Appeals held that the prosecution may not "bolster" the testimony of a witness who has made an out-of-court identification by introducing the testimony of another witness who merely observed the identification.  *Id.*

---

[8] The record reflects that Petitioner's mug shot was admitted, with a cautionary instruction, after the trial court found that Petitioner had changed his appearance between his arrest and the trial.  (T. 1007, 1039-40)

A *Trowbridge* claim is a matter of state law.  *See Steed v. New York Exec. Dep't Div. of Parole*, 2000 U.S. Dist. LEXIS 15497 (S.D.N.Y. 2000).  It is clearly established that "federal habeas corpus relief does not lie for errors of state law." *See*, e.g., *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)(internal citations omitted); *see also Snow v. Reid*, 619 F. Supp. 579, 582 (S.D.N.Y. 1985)("[bolstering] is at most a New York State rule or policy").  Accordingly, Petitioner's bolstering claim is not subject to habeas review and should be dismissed.

### E.    Third Ground Asserted: Violations of Sixth and Fourteenth Amendment Rights

Petitioner's third ground for relief is presented as an ineffective assistance of counsel claim.  Portions of Petitioner's argument under this rubric can, however, be read to raise a Due Process challenge to certain rulings of the trial court.  Accordingly, I have bifurcated Petitioner's claim for ease of analysis.

#### 1.    Ineffective Assistance of Counsel

Petitioner claims his defense attorney, Robert P. McGrath, Esq., furnished ineffective assistance of counsel in violation of the rights granted Petitioner by the Sixth and Fourteenth Amendments to the United States Constitution.  *See* Pet. at 10.  To prevail on this claim, Petitioner must show that: 1) counsel's performance fell below an objective standard of reasonableness; and 2) a reasonable probability exists that, but for counsel's error(s), the outcome of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).  Under *Strickland,* there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Moreover, act or omissions by counsel that "might be considered sound trial strategy" do not constitute ineffective assistance.  Id.

Petitioner's principal challenge to his attorney's performance relates to testimony about an out-of-court identification made by Cabrera.  Defense counsel made a pretrial motion to suppress identification testimony, and a *Wade* hearing was ordered (T: 4). "The purpose of a *Wade* hearing is to determine [before] the trial whether pretrial identification procedures have been so improperly suggestive as to taint an in-court identification." *Twitty v. Smith*, 614 F.2d 325, 333 (2d Cir. 1979)(citing *United States v. Wade*, 388 U.S. 218, 242 (1967))  The defense contention was that the White Plains police improperly arranged for Cabrera to view Petitioner in handcuffs, a highly suggestive procedure that tainted Cabrera's purported identification of Petitioner as the person who had stolen his Jeep and kidnapped Perez.

At the *Wade* hearing, Detective John Jackson of the White Plains Police Department testified that Cabrera saw Petitioner being brought into the station for questioning and offered him an unprompted identification of Petitioner as Perez' abductor (T: 25-38).  Jackson unequivocally stated that he had no prior knowledge of Petitioner's arrival on the detective's floor of the station; that Petitioner's presence came as a surprise; and that he did not advise Cabrera that he would be viewing a suspect in the crime (T: 30-32).  Defense counsel argued at the close of the hearing that Jackson had, in fact, deliberately retained Cabrera "in order for him to observe these people [Petitioner and Moran]…being brought in in handcuffs" (T: 40).  Giving "full credence" to Jackson's testimony, the trial court found that Cabrera's statement was "a spontaneous or non-police arranged identification" and denied Petitioner's motion to suppress (T: 50-52).

At trial, Cabrera flatly contradicted Detective Jackson's explanation of the encounter at the police station:

> Q:     Did there come a time when you were at the police department that you saw the individual who had driven away with your Jeep Cherokee?
> A:     Not in court, no.  Just one time, but when they grabbed him.
> Q:     Okay.  Let me ask the question again.  I think there might be some confusion.  When you were at the police station on the evening of September 27, 2001, did you see in the police station the person who had stolen your Jeep Cherokee that evening?
> A:     Yes, I saw him but – (pause).
> Q:     You saw him?
> A:     Yeah.  **The man that made me fill out the papers, the detectives told me they grabbed him.  I was there like four and a half hours, five hours waiting.  They told me they had already grabbed him.  And they said they're gonna come out in a hallway and you're gonna notice if it's them or not.  They brought them in handcuffs.**  The one in white I didn't see.  The black kid with the black sweatshirt, I did see him with his hair braided.  That's the only time I saw them.

(T: 819-820) [emphasis added]  The trial court halted the proceedings and held a conference out of the presence of the jury.  The State conceded an "obvious discrepancy" between Jackson's testimony at the *Wade* hearing and Cabrera's recollection of events, i.e., that, according to the victim Cabrera, Jackson had, in a deliberate and premeditated manner, arranged for him to view Petitioner in handcuffs.  Petitioner's counsel promptly moved for a trial order of dismissal (T: 823).  The trial court treated Petitioner's request as a motion for mistrial and denied same (T: 825).[9]  However, the trial court also barred any further testimony regarding the purported identification at the police station (T: 825).

During this conference, the State inquired as to whether the jury would be instructed to disregard the testimony. (T: 827).  The trial court indicated that no such instruction would be forthcoming "unless Mr. McGrath (Petitioner's counsel) is asking to have the jury disregard the testimony" (T. 827).  McGrath did not request such an

---

[9] A trial order of dismissal pursuant to N.Y. C.P.L. § 290.10 (2002), which may be granted at the close of the State's case or at "the conclusion of all evidence," was apparently not the appropriate remedy.

instruction.  McGrath also rejected the opportunity to cross examine Cabrera with regard to this testimony (T: 827).

The above-described events demonstrate that defense counsel took reasonable steps to resist identification testimony by Cabrera.  First, McGrath filed an appropriate motion to suppress the identification and was granted the *Wade* hearing in response.  At the *Wade* hearing, McGrath extensively cross examined Jackson with regard to the circumstances surrounding Cabrera's purported identification at the White Plains station (T: 32-38).  After the officer's testimony, McGrath renewed his motion to suppress the identification, arguing "that in fact it was a deliberate retention of the witness in the police station in order for them to observe these people…to be interviewed in the detective division" (T: 40).  While McGrath's contentions regarding a "deliberate retention" would later be supported by the testimony of Cabrera, the trial court denied the motion to suppress at the pretrial stage.  Any error with regard to the motion to suppress Cabrera's identification does not lie with defense counsel as he clearly made all proper efforts to prevent the testimony in question.

After the conflict between Jackson and Cabrera's recollection of events emerged, attorney McGrath sought a dismissal, a motion which the trial court treated as a motion for mistrial and denied (T: 825).  The record indicates that counsel's other decisions with regard to the purported "perjury" of Jackson were the result of trial strategy:

> The Court:  . . . Do you have any other questions of this witness along those lines? Because I was going to preclude it.
> Mr. Schorr:      No.
> The Court:      Not unless you want him to continue, Mr. McGrath.
> Mr. McGrath: No.  I don't think so.

*      *      *

> The Court:     My opinion, unless Mr. McGrath is asking to have the jury disregard the testimony, my opinion is that you have – you brought out what took place.
>
> Mr. Schorr:     Okay.
>
> The Court:     As Mr. McGrath indicated, it's helpful to his client.  It appears to be possibly police misconduct that way it was done, and he may want that to appear on the record.
>
> Mr. Schorr:     Okay.  I will preclude.
>
> The Court:     You can't offer any detectives, and I would stop you from any further testimony with respect to what took place there unless Mr. McGrath wants to explore on cross examination, if he feels it's helpful to his client.
>
> Mr. McGrath:  I have no intention of doing that.

(T: 826-827).  The record is clear that defense counsel was aware of his options with regard to the conflicting testimony and made a strategic choice.  A decision to exploit the conflict between Cabrera's and Jackson's testimony would necessarily have placed Cabrera's out-of-court identification of Petitioner—which the trial court had just precluded the State from proving—before the jury.  The tactical soundness of counsel's decision to forgo this blunder is clear.  Because counsel's approach "might be considered sound trial strategy," *Strickland*, 466 U.S.at 689, Petitioner's ineffectiveness claim fails.

Further, even if McGrath's choice not to pursue a strategy of highlighting Detective Jackson's "perjury" was an error, Petitioner was not prejudiced.  "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Nix v. Whiteside*, 475 U.S. 157, 175 (1986).  Jackson's testimony at trial was largely limited to laying a foundation for admitting a map depicting the crime locations and introducing Petitioner's mug shot (T: 1055-1071).  Even assuming that it could be established that Jackson had lied at the *Wade* hearing, Jackson's relatively minor role at trial meant that a discrediting cross-examination of Jackson would have had little impact.  And, once again, any exploration of the conflict between Jackson's hearing testimony and

16

Cabrera's testimony at trial would have brought Cabrera's identification of Petitioner before the jury—the specific situation the defense was seeking to avoid.  Given the limited scope of Jackson's trial testimony and the substantial downside to the proposed line of cross examination, there is no reasonable probability that this tactic would have resulted in a different verdict.

Petitioner further alleges that a later ruling by the trial court, i.e., the admission into evidence of a photograph taken of Petitioner at the time of his arrest—colloquially, a "mug shot"—"prevented the defense from being effect (*sic*) and did violate the Defendant's Fourteenth Amendment to the United States Constitution.  Also, denied the Defendant a fair trial."  Pet. at 10A.  However, McGrath repeatedly objected to the introduction of the photographs in question. (T: 948; 951)  Said objections included citation to case law purportedly in support of the defense's position (T: 951).  The trial court overruled these objections, finding that:

> Mr. Delgadillo's photograph is admissible…based on the fact that it is within the province of the jury to evaluate the descriptions provided by the witnesses in relation to the actual appearance of Mr. Delgadillo at the time of the alleged commission of the crime...

(T: 1008).[10]   McGrath specifically sought exception with the trial court's ruling as to admission of the photograph in question (T: 1011).  It appears that defense counsel made all reasonable efforts to prevent the introduction of the evidence at issue, defeating Petitioner's claim of ineffective assistance of counsel.

---

[10] The trial court stated that, "in reading the applicable law, the Court finds that where defendant's appearance has changed since the time of his arrest…a photo is admissible to show how his appearance was at the time of the commission of the crime" (T: 1007).  In support of this contention, the prosecution cited to *State v. Nogueras*, 196  A.D.2d 448 (N.Y. App. Div. 1993).

Petitioner also asserts that defense counsel erred by failing to request reopening of the *Wade* hearing. Supplemental *pro se* brief, pp. 45 – 51, incorporated by reference in Pet. Once the trial court interrupted Cabrera's testimony, precluded identification testimony, and offered to strike the testimony Cabrera had given concerning the events at the police station, however, the court had in effect granted the remedy which had been sought by the defense through the pretrial motion. Counsel could have accomplished nothing more by moving to re-open the *Wade* hearing.[11]

Petitioner further claims that defense counsel should have "investigated or had an investigation conducted (interviewed the alleged victims.)" Supplemental *pro se* brief, pp. 45-51, incorporated by reference in Pet. This contention is speculative in that it assumes that defense counsel had pre-trial access to the victims; furthermore, it assumes that these victims of violent crimes would have chosen to cooperate with a defense investigation by agreeing to submit to interviews. With regard to the victim witnesses other than Cabrera, Petitioner's claim is also entirely conclusory as there is no evidence that Rooke or Perez would have told the defense (in a hypothetical interview) anything other than what these witnesses testified to at trial. Speculative or conclusory claims of inadequate investigation are insufficient to establish ineffective assistance. *See Croney v. Scully,* 1988 U.S. Dist. LEXIS 6469 *4-5 (E.D.N.Y. 1988), *aff'd,* 880 F.2d 1318 (2d Cir. 1988). With regard to Cabrera, an interview (*if* the witness made himself available to the

---

[11] While Petitioner also asserts that reopening of the *Wade* hearing may have led to the suppression of Perez' identification, he offers no facts in support of same. At the *Wade* hearing, Officer Formoso offered testimony as to the Perez identification (T: 4-25). At trial, no evidence emerged impugning the *Wade* hearing testimony by Officer Formoso and Petitioner has offered none in the instant petition.

defense) would conceivably have uncovered Cabrera's version of the events leading up to the out-of-court identification of Petitioner at the police station.  Earlier disclosure of the conflict between Cabrera's and Johnson's accounts would conceivably have led to a different outcome in the *Wade* hearing.  However, the trial court ultimately precluded the State from introducing evidence about the stationhouse identification, so there is no basis to conclude that a pre-trial interview of this witness by the defense would have changed the outcome of the trial.

Finally, Petitioner presents a list of additional acts and omissions of counsel which he describes as "unprofessional errors."  Supplemental *pro se* brief, incorporated by reference in Pet., pp 51-54.  Points "A" and "C" raise issues concerning counsel's cross-examination of Cabrera and Rooke which fall squarely within the category of unreviewable trial strategy.  *See United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)(decisions as to extent and manner of cross-examination are "strategic in nature.") Point "B" attacks counsel for advising the trial court (in response to a direct question) that the defense had no witness list, and also for failing to object when the prosecution commented in summation on defense counsel's failure to prove certain facts he had proffered in his opening statement.[12]  These were not errors. Petitioner's Point "D" faults counsel for choosing not to object when a witness blurted out a previously-undisclosed statement made by the defendant because counsel did not want to "heighten the matter," but this was clearly a decision of trial strategy.  In Point "E" Petitioner argues that his attorney should not have consented to conduct a portion of the charging conference in defendant's absence, but this was clearly a hearing on a question of law, *see Rule*

---

[12] Defense counsel's decision to "open strong" by presenting a defense theory which gained little evidentiary support during the trial was clearly a tactical gamble.

19

*43(b)(3), Fed. R. Crim. P.*, and Petitioner does not claim to have been prejudiced by this procedure. As to Petitioner's Point "F," relating to counsel's failure to object when Petitioner's accomplice, Segundo Moran, was added to the State's witness list, Moran was not, in fact, called as a witness, so there is no basis for any claim that Petitioner was injured by his counsel's failure to object.

### 2.     Violation of Due Process Rights

Petitioner further asserts, within Ground III of his petition, that his Fourteenth Amendment rights were violated, i.e., "the decision of the state courts were unreasonable and contrary to the laws of the State of New York and the United States Constitution." Pet. at 10A. While the basis for this claim is not clearly laid out in the petition, the *pro se* petition is liberally construed to raise the "strongest argument [it] suggests." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007). Petitioner can be read to raise a Due Process issue with regard to the interplay between the testimony of Gregorio Cabrera and Petitioner's mug shot.

As detailed at pages 13-16, *supra*, the trial court denied a pretrial motion to suppress identification testimony by Cabrera on the strength of the testimony of Detective John Jackson, who insisted at the *Wade* hearing that the police had done nothing to orchestrate an encounter at the stationhouse during which Cabrera observed Petitioner in handcuffs. At trial, Cabrera gave contradictory testimony, which made it clear that, in his version, Detective Jackson had deliberately staged the encounter. After hearing Cabrera's account of the events leading up to the stationhouse identification, the trial court reversed

its pretrial ruling and precluded any identification testimony by Cabrera.[13]   By the time

the court intervened, however, Cabrera had stated in front of the jury that he saw the man

who stole his Durango – a "black kid with the black sweatshirt . . . with his hair braided"

– under arrest at the police station.  (T.820)  Later on in the trial, the State would

introduce an arrest photograph which depicted Petitioner in a black sweatshirt and with

his hair braided into cornrows.  Despite the trial court's effort to preclude testimony

derived from the suggestive identification procedure, it is not unlikely that the jury

inferred that Cabrera identified Petitioner at the police station shortly after the crimes.

There is precedent for the proposition that a combination of evidentiary rulings

can rise to the level of a due process violation.  *See*, e.g., *Chambers v. Mississippi*, 410

U.S. 284 (1973).  However, such claims are subject to harmless error analysis, which in

this context means that any error was harmless unless it "had substantial and injurious

effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S.

619, 631 (1993).[14]

Here, any improper inference that Cabrera identified Petitioner at the police

station was eclipsed by the identification testimony provided by Gloria Perez, who spent

some two hours in close proximity to her assailant.  Perez – whose out-of-court

identification is not challenged – identified Petitioner moments after he was detained on

the evening of the crime, and, unlike Cabrera, she also identified Petitioner as her

---

[13] The prosecutor, Daniel Schorr—who had previously presented Detective Jackson's testimony at the *Wade* hearing—apparently learned of Cabrera's contradictory account earlier in the day, but nonetheless elicited the cited testimony from Cabrera in front of the jury without notifying the court or defense counsel of the discrepancy (T: 823).

[14] The relatively forgiving *Brecht* standard applies in § 2254 proceedings "whether or not the state appellate court recognized the error" and performed harmless error analysis on direct review.  *Fry v. Pliler*, 551 U.S. 112 (2007).

attacker at trial.  As noted above, Perez's testimony was corroborated by physical

evidence (the sandal) recovered from the crime scene as well the circumstantial evidence

(Petitioner was a shoeless passenger in Moran's damaged Durango) surrounding

Petitioner's arrest.  Under these circumstances, it cannot be said that Cabrera's truncated

testimony about an identification at the police station – even if tied to the Petitioner via

the mug shot – had substantial and injurious effect on the jury's verdict.  Thus, any error

in the admission of this evidence was harmless.

### IV.    Conclusion

For the reasons set forth above, I respectfully recommend that this Petition be

DISMISSED with prejudice.

Further, because Petitioner has not made a substantial showing of a denial of a

federal right, this Court recommends that no certificate of appealability be issued. *See* 28

U.S.C. § 2253(c)(2); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d

Cir. 2000), *cert. denied* 531 U.S. 873 (2000).

I also recommend that the Court certify pursuant to 28 U.S.C. § 1915(a)(3) that

any appeal from its order would not be taken in good faith. *See Coppedge v. United

States*, 369 U.S. 438 (1962).

### V.    Notice

Pursuant to 28 U.S.C. §636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the

parties shall have ten (10) days, plus an additional three (3) days, pursuant to Fed. R. Civ.

P. 6(d), or a total of thirteen (13) working days, *see* Fed. R. Civ. P. 6(a), from the date

hereof, to file written objections to this Report and Recommendation.  Such objections, if

any, shall be filed with the Clerk of the Court, with extra copies delivered to the

chambers of The Honorable Stephen C. Robinson, United States District Judge, at the

United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to

the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude

later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge

Robinson.


Dated:   March 31, 2009
         White Plains, N.Y.



Respectfully submitted,


PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE.